IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Pavelle Michelle Lee, | ) | C/A No.: 1:16-2429-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On October 25, 2012, Plaintiff filed an application for DIB in which she alleged her disability began on November 20, 2011. Tr. at 181–84. Her application was denied initially and upon reconsideration. Tr. at 114–17 and 121–22. On November 19, 2014,

Plaintiff had a hearing before Administrative Law Judge ("ALJ") Alice Jordan. Tr. at 25–80 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 6, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 18–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 6, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 29 years old at the time of the hearing. Tr. at 40. She completed high school and two years of college. Tr. at 42–43. Her past relevant work ("PRW") was as a forklift operator, a hair assembler, an inspector, and a prep weigher. Tr. at 75–76. She alleges she has been unable to work since February 1, 2013.[1] Tr. at 38–39.

2.    Medical History

Plaintiff presented to Michelle Nobles, M.D. ("Dr. Nobles"), to establish care on October 9, 2012. Tr. at 287–88. She endorsed a history of hypertension and hypothyroidism. Tr. at 287. She reported constipation, urinary frequency, paresthesias in her hands and feet, and a 40-pound weight gain over the prior nine-month period. *Id.* She was 5' 3 3/4" tall and weighed 277.2 pounds. *Id.* Dr. Nobles assessed benign essential hypertension, hypothyroidism, and obesity. Tr. at 288. She referred Plaintiff for lab work,

---

[1] During the hearing, Plaintiff's attorney moved to amend her alleged onset date to February 1, 2013. Tr. at 38–39.

prescribed Hydrochlorothiazide for hypertension and instructed her to follow up in two weeks. *Id.*

On October 23, 2012, Plaintiff reported left hand pain and tingling and itching in her bilateral feet. Tr. at 289–90. She complained of occasional headaches and dizzy spells and indicated she had experienced poor vision for more than a year. Tr. at 289. Neurological and mental status examinations were normal. Tr. at 290. Roland Rogers, APRN ("Mr. Rogers"), assessed depression and anxiety disorder, not otherwise specified ("NOS"). *Id.* He discontinued Hydrochlorothiazide and prescribed Lisinopril-Hydrochlorothiazide for hypertension and Zoloft for depression. *Id.*

On January 22, 2013, state agency consultant Debra C. Price, Ph. D. ("Dr. Price"), reviewed the evidence and completed a psychiatric review technique form ("PRTF"). Tr. at 95–96. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and found that Plaintiff had no restriction of activities of daily living ("ADLs"); no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* Craig Horn, Ph. D. ("Dr. Horn"), reached the same conclusions on April 26, 2013. Tr. at 105–06.

State agency medical consultant James Key, M.D. ("Dr. Key"), completed a physical residual functional capacity ("RFC") assessment on January 22, 2013. Tr. at 97–98. He found that Plaintiff had no exertional limitations, but that her postural limitations restricted her to occasional climbing of ladders, ropes, and scaffolds and that her environmental limitations required she avoid even moderate exposure to hazards. *Id.*

Adrian Corlette, M.D. ("Dr. Corlette"), assessed the same RFC on April 30, 2013. Tr. at 107–09.

On April 23, 2013, Plaintiff reported to Mr. Rogers that she had felt suicidal during the prior week and had planned to overdose on medications. Tr. at 294. She stated she no longer felt suicidal, but had scheduled a mental health appointment. *Id.* Musculoskeletal, neurological, and mental status examinations were normal. Tr. at 295. Mr. Rogers counseled Plaintiff on diet and tobacco cessation and referred her to an addictions counselor. Tr. at 295–96.

On May 3, 2013, Plaintiff complained of a headache and tingling in her fingertips and toes. Tr. at 297. Toni Williams ("Ms. Williams"), indicated Plaintiff was "pleasant," "in no apparent distress," and had "good attention to hygiene and body habitus." *Id.* She noted no abnormalities on physical examination. Tr. at 297–98. She diagnosed benign headache syndromes, prescribed Tylenol-Codeine, and instructed Plaintiff to return if the condition worsened. Tr. at 298.

On May 23, 2013, Plaintiff indicated she continued to experience headaches and neuropathic pain in her extremities. Tr. 299. Mr. Rogers stated Plaintiff was "pleasant," "in no apparent distress," and showed "good attention to hygiene and body habitus." Tr. at 300. He indicated Plaintiff weighed 279.4 pounds, but had normal musculoskeletal, neurological, and psychiatric examinations. *Id.* He assessed idiopathic peripheral neuropathy and exercise-induced bronchospasm. Tr. at 301. He prescribed ProAir HFA and Neurontin and advised Plaintiff to modify her diet and to lose weight. *Id.*

Plaintiff presented to Spartanburg Area Mental Health ("SAMH") for an initial clinical assessment on June 3, 2013. Tr. at 314–19. She reported that Zoloft was not working and that she was isolating from others. Tr. at 314. She stated she had "trust issues" and had been raped at the age of three and involved in an abusive relationship in 2010. *Id.* She also reported having been physically and verbally abused by her mother during her childhood. *Id.* She indicated she sometimes did not bathe, eat, or brush her teeth and felt unmotivated to care for her four children. *Id.* She stated she had problems with insomnia, increased appetite, a 60-pound weight gain, and decreased energy. Tr. at 317. William S. Powell, M.D. ("Dr. Powell"), observed the following on a mental status examination: clean appearance and hygiene; appropriate motor activity; flat affect; depressed mood; soft speech; normal thought process; paranoid and phobic thought content; no evidence of hallucinations or delusions; alert and oriented to person, place, time, and situation; poor decision making that adversely affects herself and others; minimizes problems; intact memory; easily distracted concentration; and below average fund of knowledge. Tr. at 316–17. He diagnosed major depressive disorder and assessed Plaintiff's global assessment of functioning ("GAF") score[2] to be 50.[3] Tr. at 318–19. He

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[3] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

discontinued Zoloft and prescribed 20 milligrams of Celexa and 150 milligrams of Trazodone. Tr. at 319. He advised Plaintiff to exercise and to follow a healthy diet. *Id.*

On July 15, 2013, Aletta Thompson, RN-BC ("Ms. Thompson"), observed Plaintiff to be alert and oriented to person, time, place, and situation; to be appropriately dressed and groomed; and to demonstrate a flat affect. Tr. at 321. Plaintiff denied having started the prescriptions for Celexa and Trazodone and stated she had lost them during a move. *Id.* She indicated she remained depressed, was sleeping for three to four hours per night, and was napping during the day. *Id.*

Plaintiff reported that her blood pressure was not well-controlled and that Neurontin was ineffective on July 18, 2013. Tr. at 302. Mr. Rogers again noted Plaintiff was pleasant, in no apparent distress, and had good attention to hygiene and body habitus. Tr. at 303. Musculoskeletal, neurological, and mental status examinations were normal. *Id.* Mr. Rogers noted Plaintiff was only taking Neurontin once a day and instructed her to take it three times a day, as prescribed. Tr. at 304. He also advised her to take her blood pressure medication, to reduce her sodium, to engage in regular exercise, to work on weight management, and to maintain a blood pressure log. *Id.*

On July 31, 2013, Plaintiff reported Trazodone and Celexa were ineffective. Tr. at 324. Laurel A. Weston, M.D. ("Dr. Weston"), indicated Plaintiff described symptoms that suggested mood disorder, NOS versus bipolar disorder. *Id.* Plaintiff described a rapidly shifting mood that was generally characterized by depression and irritability, but also indicated a history of impulsive decisions. *Id.* She reported auditory hallucinations of hearing a baby crying and referential thinking and fearfulness. *Id.* She described classic

6

symptoms of panic attacks, including cardiac palpitations and hyperventilation symptoms. *Id.* She endorsed social withdrawal and isolation consistent with agoraphobia. *Id.* Dr. West observed Plaintiff to be cooperative and to have referential and occasionally incomplete thought content, but to deny suicidal and homicidal ideations. Tr. at 325. She assessed bipolar disorder, NOS, and panic disorder with agoraphobia. *Id.* She indicated Plaintiff's GAF score to be 60.[4] *Id.* She discontinued Celexa and Trazodone and prescribed Depakote ER. *Id.*

On August 29, 2013, Plaintiff denied having started Depakote because she was afraid of possible side effects. *Id.* Dr. Weston observed Plaintiff to be alert, oriented, cooperative, and to deny suicidal and homicidal ideations. Tr. at 323. She assessed Plaintiff's GAF score to be 60. *Id.*

On September 3, 2013, Plaintiff reported her blood pressure continued to be elevated. Tr. at 305. Mr. Rogers observed Plaintiff to have no abnormalities on musculoskeletal, neurological, and mental status examinations. Tr. at 306. He prescribed 10 milligrams of Norvasc for hypertension and 875 milligrams of Amoxicillin for a dental abscess. Tr. at 307.

Plaintiff followed up at SAMH on September 10, 2013. Tr. at 326. The nurse observed Plaintiff to be alert and oriented to person, place, time, and situation; to be reasonably dressed and groomed; to maintain good eye contact; and to interact easily. Tr. at 327. Plaintiff reported having started Depakote ER, misplaced the medication for two

---

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

days, and resumed taking it on the prior night. *Id.* She denied suicidal and homicidal ideations, auditory and visual hallucinations, and acting out. *Id.* She endorsed mood lability with depression and irritability and difficulty sleeping at night. *Id.*

On September 26, 2013, SAMH intervention staff member Katherine Garland ("Ms. Garland") described Plaintiff as having an odor. Tr. at 332. Plaintiff reported bathing once or twice a week and eating one meal a day as a result of depression. *Id.* She indicated her mother had taken over caring for her and her children. *Id.* Ms. Garland indicated Plaintiff had made no progress and continued to be very depressed. *Id.*

Plaintiff reported a one-week history of sore throat and neck pain on October 23, 2013. Tr. at 308. She also complained of a recent seven-pound weight gain. *Id.* She weighed 292 pounds. Tr. at 309. Ms. Williams observed her to be pleasant, in no apparent distress, and to show good attention to hygiene and body habitus. *Id.* She described Plaintiff's mood as euthymic and noted no abnormalities on examination. Tr. at 309–10. Plaintiff's hemoglobin A1C was elevated. Tr. at 310. Ms. Williams assessed prediabetes, prescribed Metformin, and provided information to Plaintiff regarding a diabetes class. Tr. at 310–11.

Plaintiff met with Ms. Garland on November 15, 2013. Tr. at 331. She reported bathing once or twice a week and stated she was struggling to pay her bills. *Id.* Ms. Garland encouraged Plaintiff to bathe daily and to model appropriate behavior for her children. *Id.* She indicated Plaintiff had a flat affect and was making very little progress. *Id.*

On December 13, 2013, Plaintiff reported having discontinued Depakote ER. Tr. at 328. She stated she took the medication for two months and then decided to stop taking it because she did not feel like it was providing any benefit. *Id.* She described persistent depression with dysphoria, low energy, and vegetative changes. *Id.* She complained of daily panic attacks and agoraphobia. *Id.* Dr. Weston assessed a GAF score of 55, discontinued Depakote ER, and prescribed Lexapro and Klonopin. Tr at 329.

On December 23, 2013, Plaintiff reported to Ms. Garland that she stayed in bed on most days and relied on her mother to care for her children. Tr. at 335. Ms. Garland indicated Plaintiff was making no progress and was unable to recall whether she was taking her medications daily. *Id.*

Plaintiff presented to Julia Roos, M.D. ("Dr. Roos"), to establish care on January 14, 2014. Tr. at 346. She reported being unable to lose weight despite the fact that she was walking for an hour a day and following a 1200 calorie diet. *Id.* She stated she experienced shortness of breath that required use of an Albuterol inhaler twice a day. *Id.* She weighed 295 pounds. Tr. at 348. Dr. Roos observed Plaintiff to have no edema or neurological focal deficits; to demonstrate normal sensation, reflexes, coordination, muscle strength, and tone; to be alert and cooperative with normal mood and affect; and to have normal attention span and concentration. Tr. at 348–49. She assessed hypertension, morbid obesity, uncomplicated type II diabetes, peripheral idiopathic neuropathy, bipolar disorder, and shortness of breath. Tr. at 349–50. She ordered lab work and referred Plaintiff for spirometry. Tr. at 350.

Plaintiff reported being a little less depressed on January 24, 2014. Tr. at 333. She indicated Klonopin had improved her sleep and helped her to avoid "full blown panic attacks." *Id.* She continued to report "limited panic attacks" and stated her morning dose of Klonopin made her feel so sedated that she could not care for her children. *Id.* She complained of significant financial stressors. *Id.* Dr. Weston observed Plaintiff to be alert and cooperative, to have normal speech, and to deny hallucinations, delusions, and suicidal and homicidal ideations. Tr. at 333–34. She discontinued Klonopin, prescribed Xanax, and assessed a GAF score of 60. Tr. at 334.

On February 10, 2014, Dr. Weston observed Plaintiff to be neat and well-groomed. Tr. at 337. She noted Plaintiff had a calm mood and affect and was alert and oriented. *Id.* Plaintiff denied having taken Xanax because she thought it was causing tremors and more anxiety. *Id.* The nurse informed Plaintiff that her inhaler was likely causing the tremors and advised her to take Xanax as needed, but to avoid stopping the medication abruptly. *Id.*

On February 20, 2014, Plaintiff complained of burning and numbness in her feet and stated Neurontin was providing no relief. Tr. at 376. Dr. Roos observed Plaintiff to be alert and cooperative and to have normal mood, affect, attention span, and concentration. Tr. at 378. A diabetic foot examination was normal. *Id.*

Plaintiff presented to Carla Turner, LPC ("Ms. Turner"), for an initial visit on March 13, 2014. Tr. at 341. Ms. Turner described Plaintiff as oriented to time and place, alert, well-groomed, soft spoken, cooperative, and exhibiting good concentration abilities throughout the visit. *Id.* Plaintiff agreed to attend monthly counseling sessions. *Id.*

10

Plaintiff reported a persistent cough on April 9, 2014. Tr. at 363. Dr. Roos indicated a pulmonary function test had shown mild obstruction. *Id.* She observed Plaintiff to have decreased breath sounds. Tr. at 365. Dr. Roos administered a nebulizer treatment and indicated Plaintiff's air movement improved. *Id.* She continued Plaintiff's prescription for Spiriva and added Symbicort. *Id.*

Plaintiff reported being discouraged by her financial and familial situations on April 18, 2014. Tr. at 340. She complained of poor sleep and indicated she had recently moved in with her aunt. *Id.* Ms. Turner encouraged Plaintiff to practice skills to decrease her stress and anxiety. *Id.*

Plaintiff followed up with Dr. Roos on April 23, 2014, and reported little improvement with Symbicort. Tr. at 382. She indicated she was using Albuterol three to four times a day and continued to experience shortness of breath with minimal walking. *Id.* Dr. Roos observed no abnormalities on physical examination and indicated a mental examination was normal, as well. Tr. at 384. She referred Plaintiff to a pulmonologist. *Id.*

On May 19, 2014, Plaintiff stated she was able to handle Xanax without sedation. Tr. at 338. She reported being dependent on others and experiencing symptoms of agoraphobia. *Id.* Dr. Weston indicated Plaintiff was not keeping regular appointments with other providers. *Id.* Plaintiff reported some visual illusions of shadows and passive suicidal thoughts, but she denied psychotic symptoms and suicidal plan or intent. *Id.* Dr. Weston indicated Plaintiff's GAF score to be 60. Tr. at 339. She instructed Plaintiff to record her panic attacks in a journal and to follow up with Ms. Turner for psychotherapy and Jennifer Connelly for case management. *Id.*

Plaintiff reported Lyrica was working well on May 26, 2014. Tr. at 386. She reported a cough and shortness of breath, but a physical examination was normal. Tr. at 388. Dr. Roos indicated Plaintiff was alert, cooperative, and had normal mood, affect, attention span, and concentration. *Id.*

On June 3, 2014, Plaintiff presented to Amanda Fox, NP ("Ms. Fox"), complaining of a headache that had lasted for three days. Tr. at 355. She also reported pain under her chin and tenderness and tightness on the right side of her neck. *Id.* Ms. Fox indicated a physical examination was normal and that Plaintiff was alert and cooperative; had a normal mood and affect; and demonstrated normal attention span and concentration. Tr. at 357. She determined Plaintiff's headache likely resulted from neck tension and instructed Plaintiff to apply ice and to use Norflex. *Id.*

Plaintiff reported back pain on July 2, 2014. Tr. at 367. Dr. Roos observed mild tenderness to palpation in Plaintiff's mid-lower back and paraspinal region. Tr. at 369. She recommended Plaintiff engage in home exercises for back pain. *Id.*

On July 17, 2014, Plaintiff reported agoraphobia, limited social interaction, and active symptoms of panic disorder with agoraphobia that occurred two to three times per week. Tr. at 342. She denied psychotic symptoms and suicidal thoughts, plan, or intent. *Id.* Dr. Weston observed Plaintiff to be well-groomed; to have a cooperative attitude; to behave calmly; to have normal speech; to demonstrate intact associations and a logical and goal-directed thought process; to deny delusions, hallucinations, and suicidal and homicidal ideations; to have a depressed and anxious mood; to be oriented to time; to demonstrate fair judgment and insight; and to have an average fund of knowledge. *Id.*

12

She assessed a GAF score of 60 and increased Plaintiff's Xanax dosage from three to four one-milligram tablets per day. Tr. at 342 and 343. She recommended in vivo behavioral desensitization. Tr. at 343.

On August 27, 2014, Plaintiff continued to report active symptoms of panic disorder, but indicated a slight improvement in social interaction and agoraphobia. Tr. at 344. She reported symptoms that were consistent with obsessive compulsive disorder ("OCD"). *Id.* Dr. Weston observed Plaintiff to be "a little better groomed"; to have a cooperative attitude; to behave calmly; to speak normally; to have intact associations; to have a logical and goal-oriented thought process; to deny delusions and suicidal and homicidal ideations; to report visual hallucinations; to have an anxious and depressed mood; to demonstrate a slightly improved affect; to be alert and oriented to time; to have intact recent and remote memory and concentration; and to show fair judgment. *Id.* She assessed a GAF score of 60. *Id.* She increased Plaintiff's Xanax dosage to two milligrams, three times a day. Tr. at 345.

On September 4, 2014, Plaintiff reported that the pulmonologist had taken her off Spiriva and instructed her to use Albuterol as needed. Tr. at 371. She reported following a diet and walking seven miles per day with her children, but denied weight loss. *Id.* She indicated Lyrica effectively treated her neuropathy. *Id.* Dr. Roos noted no abnormalities on physical examination and described Plaintiff as alert and cooperative with normal mood, affect, attention span, and concentration. Tr. at 373. She indicated Plaintiff had gained approximately 20 pounds over the last year. *Id.* She stated Plaintiff had not

maintained a food diary, despite her recommendation. *Id.* She noted Plaintiff's A1c was elevated and added Glipizide. *Id.*

On October 6, 2014, Plaintiff reported a stabbing pain in her back and bilateral elbows and knees. Tr. at 351. She complained of numbness in her arms and elbows. *Id.* Dr. Roos observed Plaintiff to have positive Tinel's and Phalen's tests on the left, but to have normal strength and no tenderness around her left elbow. Tr. at 353. She noted Plaintiff's weight to be 305 pounds. *Id.* Plaintiff had a negative straight-leg raising test. *Id.* Dr. Roos described Plaintiff as alert and cooperative; having normal affect and mood; and demonstrating normal attention span and concentration. *Id.* She discontinued Lyrica and prescribed Gabapentin because Plaintiff's insurance no longer covered Lyrica. *Id.* She indicated Plaintiff's neuropathic symptoms were somewhat consistent with carpal tunnel syndrome and recommended Plaintiff undergo nerve conduction studies. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on November 19, 2014, Plaintiff testified she was 5' 3" tall and weighed 300 pounds. Tr. at 40. She indicated she lived in a mobile home with her aunt, cousin, and four children. Tr. at 40–41. She stated her children were four, seven, nine, and 10 years old. Tr. at 40. She indicated that her aunt paid the household expenses and that she received food stamps and child support for one child. Tr. at 41. She stated she had health coverage through Medicaid. Tr. at 42. She indicated she last worked making

hair and wig pieces in December 2012. Tr. at 43. She indicated the neuropathy in her hands prevented her from continuing the work. Tr. at 44.

Plaintiff testified that she was unable to work because of bipolar disorder, neuropathy, weight problems, depression, and crying spells. Tr. at 58. She testified she also had diabetes, hypertension, and COPD. Tr. at 59 and 61.

Plaintiff testified that Dr. Weston had diagnosed bipolar disorder. Tr. at 67. She indicated she attended counseling sessions once a month and saw her psychiatrist every six weeks to three months for medication management. Tr. at 53. She described an incident several years earlier in which she spent all of her money to take her children to the beach for an unplanned trip. Tr. at 68. She described a history of being raped by a family friend and being physically and verbally abused by her mother. Tr. at 73–74. She indicated her anxiety had been exacerbated by an abusive relationship with her youngest child's father. Tr. at 59. She stated anxiety prevented her from being around others. *Id.* She indicated she had panic attacks that were characterized by chest pain, shortness of breath, headache, dizziness, and feeling faint. Tr. at 66. She described her panic attacks as lasting from 30 minutes to an hour at a time. *Id.* She endorsed suicidal thoughts that occurred once or twice a week and indicated that she had attempted suicide by overdosing on sleeping pills as a teenager. Tr. at 70 and 74.

Plaintiff testified she had gained nearly 100 pounds in the previous two to three years. Tr. at 60. She indicated that her hemoglobin A1c had been increasing and that her doctor informed her that she would prescribe insulin at the next visit if it remained uncontrolled. Tr. at 63. She stated she had first noticed symptoms of neuropathy in her

15

hands a year-and-a-half to two years earlier. *Id.* She indicated her hands felt numb and her fingertips felt like they were being stuck with pins. Tr. at 64. She endorsed symptoms of neuropathy in her feet, toes, and knees. Tr. at 70–71.

Plaintiff estimated she could stand for 30 minutes to an hour at a time. Tr. at 71. She indicated she could lift no more than a gallon of milk. Tr. at 72. She stated she was unable to bend down or climb stairs. *Id.* She stated her medication prevented her from focusing and paying attention. Tr. at 73.

Plaintiff testified her aunt and cousin helped her care for her children. Tr. at 52. She indicated she did not get dressed every day. *Id.* She denied visiting family or friends, attending church, and participating in clubs, organizations, or activities on a regular basis. Tr. at 53. She stated she spent most of her time in her room and denied reading and watching television. Tr. at 54. She stated she bathed at least twice a week. *Id.* She denied preparing meals for her children, doing laundry, washing dishes, changing her bed linens, and performing other household chores. Tr. at 55. She indicated she did not assist her children with homework or shop for groceries. Tr. at 56. She stated she had a driver's license, but had not driven in two-and-a-half years. *Id.* She indicated she was unable to style her daughters' hair because her hand would become numb and start shaking. Tr. at 58.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Karl S. Weldon reviewed the record and testified at the hearing. Tr. at 75. The VE categorized Plaintiff's PRW as a forklift operator, *Dictionary of Occupational Titles* ("*DOT*") number 921.683-050, as medium and semiskilled; a hair

16

assembler, *DOT* number 739.384-01, as light and unskilled; an inspector, *DOT* number 529.687-118, as light and unskilled; and a prep weigher, *DOT* number 412.687-010, as light and unskilled. Tr. at 75–76. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work; could occasionally climb ladders; could frequently climb, stoop, crouch, kneel, and crawl; should avoid concentrated exposure to fumes, odors, dusts, and hazards; and could perform unskilled work with only occasional public interaction. Tr. at 76–77. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a weigher and an inspector. Tr. at 77. The ALJ asked if Plaintiff's PRW produced any transferable skills. *Id.* The VE indicated it did not. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy at the medium or light exertional level that the hypothetical person could perform. Tr. at 78. The VE identified a medium job as an order picker, *DOT* number 922.687-058, with 3,200 positions in the regional economy and 426,000 positions in the national economy. *Id.* He identified jobs at the light exertional level as a sorter, *DOT* number 789.687-146, with 900 positions in the regional economy and 167,000 positions in the national economy, and a hand packager, *DOT* number 753.687-038, with 2,900 positions in the regional economy and 798,000 positions in the national economy. *Id.*

The ALJ asked the VE to consider the same limitations in the previous question, but to further assume the individual could perform only frequent fine manipulation. *Id.* The VE stated the individual would still be able to perform the identified jobs. *Id.*

2.    The ALJ's Findings

In her decision dated January 6, 2015, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since November 20, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: obesity, depression, anxiety, neuropathy of the hands and feet (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant can occasionally climb ladders, stooping [sic], crawl, and kneel, and crawl.[5] The claimant should avoid concentrated exposure to fumes, odors, dust and gases. The claimant should avoid concentrated exposure to hazards. The claimant can have occasional interaction with the general public. The claimant can perform frequent fine manipulation. The claimant can occasionally lift and carry twenty pounds and frequently lift and carry ten pounds out of an eight-hour workday. The claimant can stand and walk six hours and sit six hours out of an eight-hour workday.

6.    The claimant is capable of performing past relevant work as a prep weigher and inspector. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2011, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 23–30.

---

[5] The ALJ repeated "crawl" in assessing Plaintiff's RFC. It is likely she meant "crouch," because she mentioned frequent crouching in the hypothetical question she presented to the VE during the hearing. Tr. at 76.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ improperly assessed Plaintiff's RFC[6];

2)    the ALJ failed to resolve conflicts between the VE's testimony and the *DOT*; and

3)    the ALJ erred in determining that Plaintiff could perform her PRW.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

---

[6] Although Plaintiff raised a separate allegation of error that pertained to the ALJ's assessment of her mental impairments, the undersigned considered it most appropriate to address her mental impairments in the context of the RFC assessment.

19

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[7] (4) whether such impairment prevents claimant from performing PRW;[8] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62

---

[7] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[8] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

(1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157– 58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      RFC

Plaintiff argues the ALJ erred in assessing an RFC that was inconsistent with the regulations. [ECF No. 8 at 7]. She maintains the ALJ stated Plaintiff was capable of performing medium work, but described lifting restrictions that were consistent with light work. *Id.* She contends the ALJ did not adequately evaluate her mental impairments and limitations. *Id.* at 12–14.

The Commissioner argues the ALJ's error in defining medium work was inconsequential because a limitation to light work would still allow Plaintiff to perform a significant number of jobs. [ECF No. 9 at 7–8]. The Commissioner maintains the ALJ appropriately evaluated Plaintiff's mental complaints and accounted for the limitations

that were supported in the record by restricting her to unskilled work with only occasional public interaction. *Id.* at 10–11.

A claimant's RFC represents the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a). The RFC assessment is used at step four of the sequential evaluation process to determine whether the claimant can perform her PRW and at step five to determine whether she may perform other work, given her age, education, and work experience. SSR 96-8p. It must be based on all the relevant evidence in the case record and should consider all of the claimant's medically-determinable impairments. 20 C.F.R. § 404.1545(a).

"The RFC assessment must first identify the individual's functional limitations or restrictions on a function-by-function basis." SSR 96-8p. The ALJ must consider the claimant's physical abilities, which include abilities to sit, stand, walk, lift, carry, reach, handle, stoop, and crouch. 20 C.F.R. § 404.1545(b). She must also consider the claimant's mental abilities, including her abilities to understand, remember, and carry out instructions; respond appropriately to supervision, coworkers, and pressures in a work setting; and meet the mental demands of PRW and other work. 20 C.F.R. § 404.1545(c).

The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p. The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's

capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ determined Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), but she also stated Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds during an eight-hour workday. Tr. at 24. She then stated "[m]edium work is defined as the ability to occasionally lift and carry twenty pounds and frequently lift and carry ten pounds out of an eight-hour workday." *Id.* The ALJ found that Plaintiff's RFC allowed for occasional interaction with the general public, but, contrary to the Commissioner's assertion, she did not include a restriction to unskilled work in the assessed RFC. *See id.*

The ALJ erred in using the regulatory definition for light work to define medium work. Pursuant to 20 C.F.R. § 404.1567(c), "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). It is unclear from the RFC assessment whether the ALJ intended to limit Plaintiff to light or medium work, and the ALJ failed to provide any guidance in her discussion of the evidence. *See* Tr. at 24–28. Although she cited diagnoses of morbid obesity and neuropathy, she concluded that the impairments had not restricted Plaintiff's abilities to ambulate, perform postural activities, complete ADLs, or attend to personal needs. Tr. at

27–28. It is unclear why the ALJ included an exertional limitation in the assessed RFC and impossible for the undersigned to determine whether she intended for the exertional limitation to be for light or medium work.

Although the ALJ included a restriction to unskilled work in the hypothetical question she presented to the VE at the hearing, she did not limit Plaintiff to unskilled work in the assessed RFC. *Compare* Tr. at 24, *with* Tr. at 77. It is unclear from the record whether her omission was conscious or inadvertent. The ALJ stated the following during the hearing:

> Even though they have not found any mental limitations here, by her testimony I'm going to put her at unskilled work and occasional interaction with the public and that's mostly based off her testimony. There's not a lot in the medical record to actually support that, but I think that based on her testimony, I find that credible enough to warrant a limitation.

Tr. at 77. This statement suggests she intended to assess an RFC that limited Plaintiff to unskilled work. In the decision, the ALJ indicated she did not find the state agency consultants' opinions that Plaintiff had no difficulties in ADLs, social functioning, or concentration, persistence, or pace to be fully persuasive. Tr. at 27. She stated claimant's impairments had become more severe than the state agency consultants initially assessed them to be. *Id.* However, she only limited Plaintiff to occasional interaction with the general public and did not explain how she considered Plaintiff's mental limitations in assessing the RFC. *See* Tr. at 24–28.

In light of the foregoing, the undersigned recommends the court find the ALJ's analysis "frustrates meaningful review" in that she failed to include a narrative discussion describing how all the relevant evidence in the case record supported her RFC

assessment. *See Mascio*, 780 F.3d at 636; SSR 96-8p. Because the ALJ must adequately determine the claimant's RFC before proceeding to steps four and five, it appears that the ALJ's errors in assessing Plaintiff's RFC would inherently infect the evaluation process and render her findings at steps four and five unsupported by substantial evidence. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

Nevertheless, because the Commissioner argues that the ALJ's error in assessing Plaintiff's RFC was "inconsequential" to her finding that Plaintiff was able to perform some jobs, the undersigned has considered the additional allegations in order to provide the court with a thorough report and to address all valid claims of harmless error.[9]

### 2.    Improper VE Hypothetical and *DOT* Conflict

Plaintiff argues the ALJ did not include the same lifting restrictions she included in her RFC assessment in the hypothetical question she posed to the VE and erred in relying on the jobs he identified. [ECF No. 8 at 7–8]. She claims the ALJ did not comply with the provisions of SSR 00-4p because she failed to ask the VE whether his testimony conflicted with the *DOT*. *Id.* at 8–9. She maintains the *DOT*'s description of her PRW as a prep weigher indicates the job to be "heavy" in exertional level. *Id.* at 9. She contends that if the ALJ intended to restrict her to "medium" work, she could not perform her PRW as an inspector because it is described as requiring "light" exertion. *Id.* at 9–10. She

---

[9] This court has traditionally excused errors as harmless in cases where the ALJ "would have reached the same result notwithstanding" the error. *See Mickles v. Shalala*, 29 F. 3d 918, 921 (4th Cir. 1994).

claims a review of the *DOT* reveals that the ALJ erred in finding that the assessed RFC would allow for performance of the jobs the VE identified. *Id.* at 10.

The Commissioner argues the ALJ's "inadvertence" in stating Plaintiff was limited to medium work and describing light work was irrelevant because the VE identified light jobs that she could perform. [ECF No. 9 at 7–8]. She claims that the ALJ's failure to ask the VE if his testimony conflicted with the *DOT* was irrelevant because Plaintiff's PRW as an inspector and alternative work as a hand packager did not require more than frequent fine manipulation. *Id.* at 8. She maintains that even if the ALJ found that Plaintiff had a maximum RFC for medium work, she was able to perform her PRW as an inspector because it was light and did not exceed the maximum RFC. *Id.* at 8–9. She contends any error on the part of the VE at step five in identifying jobs that required more than occasional stooping was inconsequential because Plaintiff's PRW as an inspector and the additional job of hand packager did not require any stooping or crouching. *Id.* at 9. She maintains that the Medical-Vocational Guidelines would direct a finding that Plaintiff was not disabled based on her age, education, and PRW. *Id.* at 8.

To support a finding that a claimant is "not disabled," the ALJ must either find that the claimant's RFC allows her to perform her PRW or that she can make an adjustment to other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v). Generally, an ALJ should look to the *DOT* as the primary source in determining whether jobs exist that an individual with the claimant's limitations may perform. 20 C.F.R. § 404.1566(d); *see also* SSR 00-4p ("[W]e rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). To

produce specific vocational evidence showing that the national economy provides employment opportunities, it is often necessary for the ALJ to solicit the services of a VE. *See Walker*, 889 F.2d at 50; *see also Aistrop*, 36 F. App'x at 147 (providing that where a claimant has both exertional and nonexertional impairments that prevent performance of a full range of work at a given exertional level, "the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform").

For the ALJ to rely on the VE's opinion, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). A VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.*

Occupational information from VE's should generally be consistent with the *DOT*. SSR 00-4p. However, when there is an apparent unresolved conflict between the *DOT* and the information provided by the VE, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE's opinion to support a determination. *Id.* The ALJ must inquire on the record as to whether the VE's testimony is consistent with the *DOT* as part of her duty to fully develop the record. *Id.* She must also "elicit a reasonable explanation for" and "resolve conflicts" between the VE's testimony and the *DOT*. *Id.* In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the court emphasized the ALJ's affirmative duty to question a VE regarding apparent conflicts with the *DOT*. The court

indicated ALJs are required "to make an independent identification of conflicts" and stated "[a]n ALJ has not fully developed the record if it contains an unresolved conflict between the expert's testimony and the *Dictionary*." *Id.* at 210.

The ALJ asked the VE whether his identification of the jobs as an order picker, a sorter, and a hand packager were consistent with the *DOT*. Tr. at 78. However, she did not ask the VE whether his response that Plaintiff could perform her PRW with the specified limitations was consistent with the *DOT*. *See* Tr. at 76–77. She also failed to ask the VE if his response that Plaintiff could still perform the specified jobs with an additional restriction for frequent fine manipulation was consistent with the *DOT*. *See* Tr. at 78.

The ALJ determined Plaintiff was capable of performing her PRW as a prep weigher and an inspector as actually and generally performed. Tr. at 28. "In the alternative," she found based on the VE's testimony that Plaintiff's age, education, work experience, and RFC would allow her to meet the requirements for jobs as an order picker, a sorter, and a hand packager. Tr. at 29.

The ALJ erred in relying on the VE's testimony to support her finding that the assessed RFC would allow Plaintiff to perform her PRW and other jobs that existed in significant numbers. A comparison of the hypothetical question presented to the VE and the RFC assessed by the ALJ reveals several discrepancies. In the hypothetical question, the ALJ limited the individual to medium work and did not specify the maximum weight she could lift on a frequent and an occasional basis. *See* Tr. at 76–77. However, in the assessed RFC, the ALJ specified Plaintiff could occasionally lift and carry 20 pounds and

frequently lift and carry 10 pounds. *See* Tr. at 24. As discussed above, these lifting restrictions were consistent with light, as opposed to medium work. The hypothetical question provided for frequent stooping, kneeling, and crawling, but the assessed RFC restricted stooping, kneeling, and crawling to occasional. *Compare* Tr. at 24, *with* Tr. at 76. The ALJ indicated the individual was limited to unskilled work in the hypothetical question, but failed to include this restriction in the assessed RFC. *Compare* Tr. at 24, *with* Tr. at 77. It is unclear whether the VE would have indicated the individual could perform Plaintiff's PRW and the jobs of order picker, sorter, and hand packager if he were presented with the same limitations in the hypothetical question that the ALJ included in the RFC assessment.

The undersigned has reviewed the five jobs the ALJ found that Plaintiff was capable of performing and has found several conflicts between the *DOT*'s description of these jobs and the limitations the ALJ included in her hypothetical question to the VE. The *DOT* number the VE provided for a prep weigher corresponds with the *DOT*'s description of a "commissary assistant," which has a strength level of heavy. 412.687-010 COMMISSARY ASSISTANT. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 673438. Thus, the strength level required to perform this work conflicts with the restriction to medium work the ALJ indicated in her hypothetical question to the VE. The *DOT*'s description of the job of inspector,[10] *DOT* number 529.687-118, indicates

---

[10] Plaintiff argues that a conflict exists between the RFC's restriction to medium work and the ALJ's finding that she could perform light work as an inspector based on the difference in exertional level. [ECF No. 8 at 9–10]. However, no conflict exists between a finding that an individual with a maximum exertional capacity for medium work could

an SVP of four, which is inconsistent with the restriction to unskilled work the ALJ included in the hypothetical question to the VE. 529.687-118 INSPECTOR, CANNED FOOD RECONDITIONING. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 674764. Neither the VE nor the ALJ identified the conflicts between the provisions included in the hypothetical question and the *DOT*'s description of these jobs. In light of the foregoing, the ALJ failed to satisfy an affirmative duty to identify and resolve conflicts between the VE's testimony and the *DOT*, and substantial evidence does not support her finding that Plaintiff was capable of performing her PRW as such work is described in the *DOT*. *See Pearson*, 810 F.3d at 209; SSR 00-4p.

Although no conflict existed between the *DOT*'s description of the jobs of picker and sorter and the VE's testimony, the ALJ created a conflict between the *DOT*'s description of those jobs and the assessed RFC when she assessed a more restrictive RFC than she included in the hypothetical question to the VE. As discussed above, the ALJ assessed Plaintiff as having the RFC to perform medium work, but incorrectly defined medium work and specified lifting restrictions for light work. *See* Tr. at 24. She also limited Plaintiff to occasional stooping. *See id.* The *DOT* identifies the job of order picker as requiring medium exertion and frequent stooping. 922.687-058 LABORER, STORES. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 688132. Thus, this job does not comply with the restriction in the assessed RFC for occasional stooping and further conflicts to the extent that the ALJ included the lifting requirements for light, as

---

perform work at a lesser exertional level. *See* 20 C.F.R. § 404.1567(c), ("If someone can do medium work, we determine that he or she can also do sedentary and light work.").

opposed to medium exertion. The *DOT*'s description of a remnant sorter, *DOT* number 789.687-146, similarly indicates frequent stooping. 789.687-146 REMNANT SORTER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 681286. Therefore, the ALJ did not meet her burden to prove Plaintiff could perform other work by relying on the existence of jobs as a picker and sorter.

The undersigned has considered the Commissioner's argument that the ALJ's errors should be considered inconsequential because no conflict exists between the VE's testimony, the assessed RFC, and the *DOT*'s description of the job of hand packager. The ALJ specified that she relied on the VE's testimony to support her conclusion that Plaintiff could perform the job of hand packager. Tr. at 29. However, the VE testified that Plaintiff could perform the job in response to a hypothetical question that did not reflect the ALJ's ultimate RFC finding, and the Fourth Circuit has held that an ALJ errs in relying on a VE's opinion in response to a question that fails to set forth all of a claimant's impairments. *See Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English*, 10 F.3d at 1085. In light of the foregoing authority, the ALJ's determination that Plaintiff could perform the job of hand packager was not based on substantial evidence.

The undersigned also finds unavailing the Commissioner's argument that the ALJ's reliance on the VE's response to the hypothetical questions was irrelevant because the Medical-Vocational Guidelines would still direct a finding that Plaintiff was not disabled. *See* ECF No. 9 at 8. Each of the Medical-Vocational Guidelines "considers only the strength or exertional component of a claimant's disability in determining whether

jobs exist that the claimant is able to perform in spite of his disability." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The Guidelines "are dispositive of whether a claimant is disabled only when the claimant suffers from purely exertional impairments." *Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002). Because the ALJ included non-exertional limitations in the assessed RFC, the Medical-Vocational Guidelines could only be used as a framework for the decision and could not be applied to direct a finding that Plaintiff was not disabled. *See* SSR 83-14; *see also* 20 C.F.R. § 404.1569a(d) (when an individual has a combination of exertional and nonexertional limitations, "we will not directly apply the rules in appendix 2 unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision").

In light of the foregoing, the undersigned recommends the court find the ALJ erred in assessing Plaintiff's ability to perform her PRW as generally performed at step four and in meeting her burden to prove that Plaintiff could perform other work at step five.

### 3.   Ability to Perform PRW

Plaintiff argues the ALJ did not make specific findings of fact regarding the mental demands of her PRW. [ECF No. 8 at 11–12]. She contends the ALJ did not comply with the provisions of SSR 82-62. [ECF No. 13 at 5].

The Commissioner argues the ALJ was not required to consider the specific mental demands of Plaintiff's PRW as she actually performed it because she found that Plaintiff was capable of performing her PRW as an inspector as generally performed. [ECF No. at 9–10].

A claimant will generally be found "not disabled" if her RFC allows her to meet the physical and mental demands of her PRW as actually performed or as customarily performed throughout the economy. SSR 82-62. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." *Id.* The ALJ must carefully evaluate the claimant's statements as to which PRW requirements can no longer be met and the reasons for her inability to meet those requirements; medical evidence establishing how the impairment limits the claimant's ability to meet the physical and mental requirements of the work; and in some cases, supplementary or corroborative information from employers, the *DOT*, and other sources on the requirements of the work as generally performed in the economy. *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is very important that the ALJ make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.*

The ALJ must make the following specific findings of fact to support a determination that the claimant can perform PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of her PRW; and (3) a finding of fact that the claimant's RFC would permit a return to her PRW. *Id.*

The ALJ stated "[t]he claimant testified that she had past relevant work as a prep weigher and inspector." Tr. at 28. She concluded that Plaintiff "retained the functional demands and job duties" of her PRW and stated that in comparing her RFC with the

physical and mental demands of her PRW, she found that Plaintiff was "able to perform it as actually and generally performed." *Id.*

The ALJ's finding that Plaintiff could perform her PRW is plagued by errors in assessing her RFC and reconciling the *DOT* and the VE's testimony. As indicated above, Plaintiff would be unable to perform her PRW as a prep weigher as generally performed because the *DOT* describes it as requiring heavy exertion. *See* 412.687-010 COMMISSARY ASSISTANT. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 673438. Furthermore, if the ALJ intended to include a restriction for unskilled work, Plaintiff would be unable to perform her PRW as an inspector as described in the *DOT* because it is classified as semiskilled work.[11] *See* 529.687-118 INSPECTOR, CANNED FOOD RECONDITIONING. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 674764. In light of the foregoing, the ALJ's errors in assessing Plaintiff's RFC and her improper reliance on VE testimony render unsupported her conclusion that Plaintiff could perform the jobs of prep weigher and inspector as generally performed.

The ALJ also failed to cite substantial evidence to support a conclusion that Plaintiff could perform her PRW as actually performed. She determined Plaintiff could meet the physical and mental demands of her PRW without referencing the demands of that work or comparing Plaintiff's statements and the other evidence of record to its

---

[11] If the ALJ intended to restrict Plaintiff to unskilled work, she could not rely on the VE's testimony to the extent that he suggested an individual restricted to unskilled work could perform Plaintiff's PRW that was classified as semiskilled. *See* SSR 00-4p ("Although there may be a reason for classifying an occupation's skill level differently than in the *DOT*, the regulatory definitions of skill levels are controlling.").

demands. Thus, the ALJ's decision fails to reflect specific findings of fact as to the physical and mental demands of Plaintiff's PRW, as required by SSR 82-62.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

February 24, 2017                              Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).